UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SIERRA CLUB,<br><br>             Plaintiff,<br><br>v.<br><br>CITY OF BOISE, an Idaho municipal corporation,<br><br>             Defendant. | Case No. 1:24-cv-00169-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is a Motion for Preliminary Injunction filed on April 2, 2024, by Plaintiff Sierra Club. Dkt. 3. Defendant City of Boise (the "City") opposed the Motion (Dkt. 10), and Sierra Club replied (Dkt. 12). The Court held an expedited oral argument on the Motion on April 17, 2024. At the conclusion of the hearing, the Court GRANTED the Motion in part and DENIED the motion in part. This decision memorializes the Court's findings and provides its analysis.

## II. BACKGROUND

Boise City Code ("BCC") Section 5-7-3 prohibits the use of sound amplification devices where the sound emanating from such devices "[i]s plainly audible within any place of residence not the source of the sound; or . . . [i]s plainly audible upon a public right-of-way or street at a distance of one hundred feet (100') or more from the source of such sound" (the "Megaphone Restriction"). There are a variety of exemptions to the Megaphone

MEMORANDUM DECISION AND ORDER – 1

Restriction, including "[s]ounds caused by activities upon any Municipal, school, religious or publicly owned property or facility; provided, that such activities have been authorized by the owner of such property or facility or its agent[.]" BCC § 5-7-4. The ordinance, and its exceptions, have been part of the Boise City Code for decades.

The City also regulates gatherings and noise in public parks. BCC Section 7-7A-5(D)(4) requires individuals hoping to "[c]onduct, sponsor, promote or publicly advertise any . . . public activity in a park; or any activities which include amplified sound" to obtain a permit before proceeding. Individual use of sound amplification devices is limited by BCC Section 7-7A-7(C), which forbids operation of such devices at a level greater than sixty-two decibels measured at a distance of twenty feet unless the operator has a permit. The Court will refer to these two ordinances together as the "Park Restrictions."

The Sierra Club is a national environmental advocacy group that seeks, in part, to raise awareness about climate change and advocate for a general transition away from fossil fuels towards other, renewable sources of energy. The group regularly engages in rallies, marches, and other public demonstrations.

Recently, the Sierra Club's Climate Justice League (the "CJL")—a group of high school and junior high students who feel strongly about the club's mission—resolved to participate in a Global Climate Strike, taking place on April 19, 2024. Members of the CJL planned to write letters to the City of Boise advocating for the adoption of climate-friendly policies. Then, they would march from the Idaho State Capitol Building to Boise City Hall, where they designed to read the letters aloud before delivering them to the City. Along the way, members planned to engage in climate-themed chanting.

Until recently, CJL members have used megaphones during their Boise-area demonstrations without permits. *See* Dkt. 3-4, at 2; Dkt. 3-5, at 3–4. However, due to a perceived uptick in the ticketing and arresting of protestors using megaphones under the Megaphone Restriction, members of the Sierra Club and its CJL have opted to conduct their recent demonstrations without megaphones. This, they allege, has hindered their ability to spread their message.

On April 2, 2024, the Sierra Club filed its Verified Complaint, challenging the Megaphone Restriction and the Park Restrictions. Dkt. 1. Specifically, Sierra Club argues that the ordinances infringe upon the speech and assembly rights guaranteed under the First Amendment and that the ordinances are impermissibly vague. *Id.* On the same day, Sierra Club filed the instant Motion for Preliminary Injunction, asking the court to prohibit enforcement of the ordinances until this case is decided. Dkt. 3.

### III. LEGAL STANDARD

Generally, to obtain a preliminary injunction, a plaintiff must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Am. Beverage Ass'n v. City & Cnty. Of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). However, "the application of this standard in First Amendment cases involves an inherent tension . . . ." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (cleaned up). The moving party must show likelihood of success on the merits, but such a showing requires the government to justify its restriction on speech. *Id.* The Ninth Circuit has

resolved this tension by requiring the moving party to make an initial showing of "a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Id.* (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011). Additionally, "[w]here, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. Of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (cleaned up).

In ruling on the Motion, the Court is mindful of the Supreme Court's recent order in *Labrador v. Poe*, 144 S. Ct. 921 (2024). There, several members of the Supreme Court questioned the value of universal injunctions—injunctions that extend to non-parties—and urged that they be retired. *Id.* at 921–28 (Gorsuch, J. concurring); 928–34 (Kavanaugh, J. concurring). The Court agrees with the premise that emergency injunctions like the one requested here by Sierra Club should be tailored to the parties who bring them. The Court also notes that nothing in *Labrador* exempts First-Amendment challenges from its reasoning. Accordingly, to the extent the Court grants injunctive relief, it should be limited to the parties at the bar.

## IV. ANALYSIS

The Court will first address Sierra Club's standing to challenge each of the ordinances. It will then separately analyze the ordinances under the preliminary-injunction framework set forth above.

MEMORANDUM DECISION AND ORDER – 4

### A. Standing

To show standing, a party typically must have suffered an injury in fact that was caused by the defendant and that can be redressed by a favorable result. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). But the injury-in-fact requirement under *Lujan* is problematic in cases involving speech restrictions because "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of Los Angeles Cnty. V. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). Thus, "in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements," and has adopted instead, "what might be called a 'hold your tongue and challenge now' approach." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003).

Under this approach, the Ninth Circuit applies "a three-factor inquiry to help determine whether a threat of enforcement is genuine enough to confer an Article III injury." *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022). The inquiry requires district courts to determine "(1) whether the plaintiff has a concrete plan to violate the law, (2) whether the enforcement authorities have communicated a specific warning or threat to initiate proceedings, and (3) whether there is a history of past prosecution or enforcement." *Id.* (cleaned up).

When applying the first prong, courts do not require plaintiffs to specify when, where, or how they plan to violate the law or ordinance at issue if they have already violated the law or ordinance in the past. *See Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 836 (9th Cir. 2012). Under the second prong, in addition to explicit threats

of enforcement, courts should also consider "the government's failure to *disavow* enforcement of the law as weighing in favor of standing." *Tingley*, 47 F.4th at 1068 (emphasis in original). Whether the threat of potential enforcement results in self-censorship is another important consideration under this prong. *Id.*; *see also Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014). Under the third prong, a lack of enforcement history carries "little weight when the challenged law is relatively new[.]" *Tingley*, 47 F.4th at 1069 (cleaned up).

### 1. Megaphone Restriction

Sierra Club has shown that its members have violated the Megaphone Restriction in the past and would like to violate the Megaphone Restriction in the future. For example, in its Complaint, Sierra Club cites to multiple demonstrations in which it used a megaphone that was "clearly audible 100 feet away or more." Dkt. 1, ¶ 3. Members of the Sierra Club's CJL claim to have been involved in similar events in the past. *See* Dkt. 3-5, ¶ 6. Under Ninth Circuit caselaw, this showing is sufficient to establish that Sierra Club has a concrete plan to violate the Megaphone Restriction.

Under the second prong, Sierra Club has cited to no specific threat of enforcement issued by the City. However, the City has not disavowed enforcement of the Megaphone Restriction. Further, Sierra Club members have shown that the Megaphone Restriction has led to self-censorship. *See* Dkt. 3-3, at ¶ 8 ("Solely because of the enforcement pattern [of the ordinances], the Sierra Club and its [CJL] chose out of fear of prosecution not to use a megaphone or PA system to communicate its messages . . . ."); Dkt. 3-4, ¶ 5 ("[S]ometime during 2023, CJL decided to stop using megaphones . . . due to an increase in police citing

and arresting people at other events for using megaphones . . . . [T]his increase in enforcement against [megaphone use] caused us to tone down our approach and rethink how we conducted our public demonstrations."). Ninth Circuit caselaw makes clear that this showing is sufficient to satisfy the second prong.

Finally, Sierra Club has cited to multiple instances in which the Megaphone Restriction has been enforced in the past. *See* Dkt. 1, ¶ 8–16. Accordingly, Sierra Club has satisfied the third prong, meaning it has standing to challenge the Megaphone Restriction.

### 2. *Park Restrictions*

The standing analysis for the Park Restrictions is largely identical to the analysis for the Megaphone Restriction—Sierra Club has violated and would like to continue to violate the Park Restrictions (Dkt. 3-3, ¶ 8; Dkt. 3-5, ¶¶ 5–8), the City has not disavowed enforcement, and Sierra Club has chilled its speech in parks (Dkt. 3-3, ¶¶ 7–10). The Court notes that Sierra Club has not cited to a history of prosecution or enforcement of the Park Restrictions. Nevertheless, courts may find a plaintiff to have standing where only the first two factors of the Ninth Circuit's test are satisfied. *See Tingley*, 47 F.4th at 1069. This is particularly appropriate here, where the Park Restrictions were enacted relatively recently. *See id.* With these considerations in mind, and conscious of the Ninth Circuit's long-standing policy that the unique standing considerations raised in a First Amendment context generally "tilt dramatically toward a finding of standing" when a plaintiff brings a pre-enforcement challenge, the Court finds that Sierra Club has sufficiently established standing to challenge the Park Restrictions. *Id.* at 1066–67.

### B. Preliminary Injunction

The Court moves now to its analysis under the preliminary injunction factors.

### 1. Likely to Succeed on the Merits

In evaluating whether Sierra Club is likely to succeed on the merits of its claims, the Court must first determine whether the ordinances restrict speech based on the speech's content or whether the restrictions are content-neutral. A regulation is content-neutral if it can be "justified without reference to the content of the regulated speech." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). An ordinance that restricts the time, place, or manner of speech falls into this category. Such a regulation will be upheld if it is "narrowly tailored to serve a significant governmental interest" and it "leave[s] open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Conversely, "[a] regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles out particular content for differential treatment." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) (cleaned up). A content-based regulation is "presumptively unconstitutional." *ACLU of Nevada v. City of Las Vegas*, 466 F.3d 784, 792 (9th Cir. 2006). It will be upheld only if it withstands strict scrutiny, meaning it is "narrowly tailored to serve a compelling state interest." *Twitter, Inc. v. Garland*, 61 F.4th 686, 698 (9th Cir. 2023). Ordinances withstand strict scrutiny only rarely. *Askins v. U.S. Dep't Homeland Sec.*, 899 F.3d 1035, 1045 (9th Cir. 2018).

The Court notes briefly that, while the standards enumerated above may sound confusingly similar to a layperson, a content-neutral restriction is not subject to the "same

degree of tailoring" as a content-based restriction. *Ward*, 491 U.S. at 798, n.6. To defend a content-neutral ordinance, the government need only show that the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985). "So long as the [regulation is] not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id. at* 800. The narrow-tailoring standard applied to content-based restrictions, however, is much more demanding. *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015).

Below, the Court will employ these frameworks as appropriate to each of the ordinances.

a.  <u>Megaphone Restriction</u>

At first blush, the Megaphone Restriction appears to be content-neutral. It proscribes all sound amplification that can be heard within a residence or on a public right-of-way from a distance of 100 feet or more. BCC § 5-7-3. The underlying message being conveyed by the sound seems to be irrelevant.

However, as noted above, BCC Section 5-7-4 exempts from the Megaphone Restriction "[s]ounds caused by activities upon any outdoor Municipal, school, religious or publicly owned property or facility" as long as those activities "have been authorized by the owner of such property or facility or its agent[.]" BCC § 5-7-4(B). Sierra Club argues that, with these exemptions, the regulation imposes a speaker-based restriction. Dkt. 3-1,

at 10–11. The Supreme Court and the Ninth Circuit have cautioned that "speaker-based regulations 'are all too often' content-based regulations in disguise." *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015)). Accordingly, "when a regulation makes speaker-based distinctions, we ask whether that speaker preference reflects a content preference. If it does, we treat it the same as any other content-based regulation and apply strict scrutiny." *Boyer*, 978 F.3d at 619 (cleaned up).

The City argues that the ordinance's exemptions are location-based, not speaker based. Dkt 10, at 15. The Court disagrees. The Megaphone Restriction allows the owners of exempted property—be it municipal, school, religious, or public—to amplify the sound of their approved messages as they see fit, *regardless* of the location of the exempted property. Meanwhile, individuals who do not own exempted property cannot. A truly location-based exemption would require an enforcement officer to determine only *where* the amplified sound comes from. The exemptions in BCC Section 5-7-4 require an enforcement officer to ask not only "where?" but also "from whom?"

For example, imagine that a church and a neighboring bakery combine their efforts to hold a bake sale to raise money for the church's youth programs. If the bakery wanted to use a megaphone to advertise the sale, it would be limited by the Megaphone Restriction. But if the church wanted to use a megaphone to share the *same* message in the *same* general location, it could do so without any restrictions. Thus, the operative distinction under the Megaphone Restriction is not *location*, but *speaker identity*.

Having determined that the exemptions to the Megaphone Restriction create a

speaker-based restriction, the Court must next decide whether the restriction reflects a content preference. The Court finds that it does. The exemptions for owners of municipal, school, or public property are most likely to be utilized by government actors sharing government-approved messages. As for the exemption of religious organizations, it is hard to imagine that the organizations would not be amplifying sound to share religious messages—or at least messages friendly to the cause of the approving religion. Ultimately, the Court does not question the value of well-intentioned governmental or religious messages. It simply fails to see a content-neutral justification for giving those messages preferential treatment over the messages of businesses, protestors, or street performers.

In sum, the Court finds the Megaphone Restriction to be a speaker-based restriction that reflects a content preference. As such, it should be treated like "any other content-based regulation" and analyzed under a strict-scrutiny framework. *Boyer*, 978 F.3d at 619. The Court, therefore, presumes the Megaphone Restriction to be unconstitutional, noting again that it can be saved only if it is "narrowly tailored to serve a compelling state interest." *Twitter*, 61 F.4th at 698.

The City's asserted interest in the Megaphone Restriction is to protect citizens from unwanted noise. Dkt. 10, at 15–16. This is a reasonable goal; however, the Megaphone Restriction is underinclusive toward that end. Returning to our church-and-bakery example—a teleworker, a movie watcher, or a sleeping baby in a nearby apartment would be no less disturbed by noise from the church than the bakery. In other words, if the City was *really* interested in protecting citizens from unwanted noise, it would drop the exemptions in BCC Section 5-7-4(B).

This conclusion is consistent with other instances where statutes or ordinances were overturned for content-based exemptions. For example, in *Arkansas Writers' Project, Inc. v. Ragland*, the Supreme Court addressed a taxation scheme on magazines. 481 U.S. 221 (1987). There, the state sales tax law exempted newspapers, and religious, professional, trade, and sports journals from taxation. *Id.* at 224. After determining that the scheme was content-based, the Supreme Court subjected the law to strict scrutiny. *Id.* at 227–32. It found that, while the state's interest in raising revenue was important, it would have been better served by abandoning exemptions altogether. *Id.* at 231–32. *See also Church of Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543–46 (1993) (finding that a city ordinance prohibiting the killing of animals, but exempting from enforcement essentially all killings *except* ritual sacrifice, failed under a strict-scrutiny analysis because the exemptions rendered the ordinance underinclusive to serve its stated goals of protecting public health and preventing animal cruelty). The same logic holds true here.

Because the Megaphone Restriction is unlikely to withstand strict scrutiny, the Court finds that Sierra Club's constitutional challenge is likely to prevail on the merits. Accordingly, it ENJOINS enforcement of the Megaphone Restriction, but only as against Sierra Club and only in the Boise downtown area. *See Poe*, 601 U.S. ___ (2024).

b.  Park Restrictions

Sierra Club attacks the Park Restrictions from a slightly different angle. It does not argue that the restrictions are content-based; rather, it contends that the restrictions' permit requirements give unconstitutional discretion to government officials to approve, deny, or revoke permits. Dkt. 3-1, at 11–14.

To evaluate the constitutionality of a permitting system, courts consider four factors, three of which are identical to the factors considered in a content-neutral analysis. *Cuviello v. City of Vallejo*, 944 F.3d 816, 827 (9th Cir. 2019). As a preliminary inquiry, courts ask whether the permitting system delegates "overly broad licensing discretion to a government official." *Id.* If it does, then the system is unconstitutional. If it does not, then courts look to whether the permitting system is content-neutral, whether it is narrowly tailored to serve a significant governmental interest, and whether it leaves open ample alternatives for communication. *Id.* Failure under any of those prongs will likewise result in the permitting system being struck down. *Id.* The Court will address each prong in turn.

### i.    Overly Broad Discretion

Beginning with the first prong, the Court acknowledges that "conferring an unbridled discretion on a licensing official creates the danger of self-censorship, as well as a danger of government censorship." *Kaahumanu v. Hawaii*, 682 F.3d 789, 807 (9th Cir. 2012). Thus, any ordinance that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official" is unconstitutional. *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969). Where licensing authority is granted to a government official, the limitations thereon should be explicit, definite, and include a temporal element. *See Doe v. Harris*, 772 F.3d 563, 580 (9th Cir. 2014); *Get Outdoors II v. City of San Diego*, 506 F.3d 886, 894 (9th Cir. 2007); *Shuttlesworth*, 394 U.S. at 151–52 (cleaned up).

The Park Restrictions require anybody wishing to host an event involving amplified

sound or wishing to amplify personal sound above a specified volume to hold a permit. BCC § 7-7A-5(D)(4); BCC § 7-7A-7(C). But the ordinances are silent on if or how permits may be denied or revoked. *Id.* Without a textual basis to support its argument that the ordinances impermissibly delegate discretion to government workers, Sierra Club argues that the Park Restrictions *imply* the kind of grant forbidden in the above-referenced caselaw—a grant of unbridled decision-making authority in some unnamed parks official. The Court disagrees.

As an initial consideration, where, after an ordinary textual analysis, a statute or ordinance remains susceptible to more than one construction, the canon of constitutional avoidance counsels against a finding of constitutional problems. *Prison Legal News v. Ryan*, 39 F. 4th 1121, 1131 (9th Cir. 2022). Here, where the ordinance is silent on the approval process, the Court could feasibly read the Park Restrictions to grant discretion to a government official. But it could just as easily interpret the process to be automatic (i.e. anyone who submits an application or pays a fee is granted a permit). Thus, in the interest of avoiding constitutional problems, the Court adopts the second reading.

The Court also notes that Sierra Club cites to a variety of cases wherein courts struck down overbroad delegations of authority; but in none of the cases was the statute or ordinance in question silent on the issue of discretion. For example, in *Kaahumanu*, Hawaii's Department of Land and Natural Resources ("DLNR") promulgated a regulation requiring anyone wanting to engage in commercial activity on public land to obtain a permit before proceeding. *Kaahumanu*, 682 F.3d at 793–96. However, the permitting scheme contained a provision granting the Chairperson of the DLNR the power to revoke

or terminate permits "for any reason in [his or her] sole and absolute discretion[.]" *Id.* at 795. The Ninth Circuit found this affirmative grant of power to violate the "unbridled discretion doctrine." *Id.* at 805–07. Similarly, in *Harris*, the Ninth Circuit found unconstitutional a statute that affirmatively granted law enforcement officers discretion to disclose the private information of sex offenders "when necessary to ensure the public safety." 772 F.3d at 579–81. And in *Shuttlesworth*, the Supreme Court invalidated an ordinance that allowed the City Commission to refuse to issue a parade permit when, "in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused" 394 U.S. at 149–50.[1] Here, where there is no affirmative grant of discretion to a government officer, the Court is wary of adopting the reasoning from those cases.

Finally, the Court acknowledges that the City did not respond to Sierra Club's arguments regarding the ordinances' unlawful grant of discretion. Sierra Club invokes *Green v. W.L. Gore & Associates* to argue that, where a party offers no response to an argument, that party concedes the argument. 2020 WL 5658352, at *4 (D. Idaho Sept. 23, 2020). As an initial matter, the Court notes that in *Green*, the Court ruled on a motion to dismiss under Rule 12(b)(6), not on a motion for preliminary injunction. *Id.* Further, there, the Court dismissed a *claim* where the plaintiff failed to defend it. *Id.* The Court also noted

---

[1] At oral argument, Sierra Club raised *Watters v. Otter* as another case supporting the argument that the Megaphone and Park Restrictions should be struck down for conferring unbridled discretion on a government official. 986 F. Supp. 2d 1162 (D. Idaho 2013). But *Watters* falls squarely in line with the cases in this paragraph and, like them, is distinguishable from the present facts. There, Idaho's Director of the Department of Administration was given "sole discretion" to waive the requirements of recently enacted administrative rules. *Id.* at 1176–77. The Court found this unfettered grant to be unconstitutional. *Id.* at 1177–78. But Sierra Club cannot point to any similar grant of authority to any government official here.

that, even had the plaintiff responded, it still would have dismissed the claim because it was not plausible. *Id.* n.3. Here, the City has failed to respond to an *argument*—it has not failed to defend a claim. Further, even if the circumstances here were analogous to those in *Green*, the Court there made no mandatory statements regarding the foreclosure of arguments. Thus, the Court rejects Sierra Club's contention that the City has conceded the discretion argument. For the reasons explained above, it also rejects the argument itself. Sierra Club has not shown that the Park Restrictions unconstitutionally grant unlimited discretion to a government official.

### ii.  Content-Neutral

Because there are no exceptions to the Park Restrictions, the question of neutrality here is easier than it was in Megaphone Restriction analysis. *See* BCC §§ 7-7A-5(D)(4), 7-7A-7(C). The Ninth Circuit has made clear that blanket restrictions are content-neutral. *See, e.g.*, *Santa Monica Nativity Scenes Comm. V. City of Santa Monica*, 784 F.3d 1286, 1295 n.5 (9th Cir. 2015). The Parks Restrictions are blanket restrictions—*anyone* wishing to amplify sound must comply with them. Accordingly, the Court finds the Park Restrictions to be content-neutral.

### iii.  Narrowly-Tailored to Significant Government Interest

The City advances two interests behind the Park Restrictions—protecting citizens from unwanted noise and regulating competing uses of public property. The Supreme Court has recognized both as significant. *See Ward*, 491 U.S. at 796 ("[G]overnment has a substantial interest in protecting its citizens from unwelcome noise.") (cleaned up); *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) ("[T]he Court has

recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally.") (cleaned up). Without the Park Restrictions, the City's interests would be achieved far less effectively than they now are. Individuals would be free to amplify music, speeches, or chants beyond reasonable bounds and without concern for other parkgoers, and competing groups would have no formal way to organize or settle disputes over park usage. Further, to the extent the Park Restrictions may be classified as broader than necessary to achieve the City's interest, they are certainly not substantially so. They allow for some amplification on an individual basis without seeking *any* prior approval, and permits are readily available to groups or individuals who want to amplify beyond the restrictions' allowances. Accordingly, the Court finds the Park Restrictions to be narrowly tailored to serve significant government interests.

### iv.    *Ample Alternatives*

Under the Park Restrictions, Sierra Club has plenty of avenues through which it can spread its message. Perhaps the most appealing and effective would be *simply obtaining a permit*. There is no activity Sierra Club has suggested it would like to engage in that would be prohibited once the club obtains a permit. If club members balk at the idea of obtaining a permit, they are free to leaflet or distribute literature in parks.  "In the 'ample alternatives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *Menotti v. City of Seattle*, 409 F.3d 1113, 1141 (9th Cir. 2005). Here, the Park Restrictions do not deny Sierra Club reasonable opportunity for communication of its message; they simply

MEMORANDUM DECISION AND ORDER – 17

protect the rights of other citizens to enjoyment of Boise parks.

*v.    Conclusion*

In sum, nothing in the record at this point in the proceedings shows that the Park Restrictions grant unbridled discretion to government officials, and in the absence of contrary evidence, the Court does not construe them to confer such a grant. Furthermore, the Park Restrictions are content neutral, they are narrowly tailored to serve significant government interests, and they leave open ample alternatives through which Sierra Club can share its message. Therefore, the Court finds that Sierra Club is unlikely to succeed on the merits of its challenge to the Park Restrictions.

"It is well-established that the first factor [of the preliminary injunction analysis] is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). Where a plaintiff fails to show likelihood of success on the merits, the reviewing court "need not consider the other factors" unless there are serious questions going to the merits. *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (cleaned up). "'Serious questions' are those which cannot be resolved one way or the other at the hearing on the injunction." *Perlot v. Green*, 609 F. Supp. 3d 1106, 1115–16 (D. Idaho 2022).

Regarding the Park Restrictions, Sierra Club has failed to show likelihood of success on the merits, and it has raised no questions that could not be resolved at the hearing. Accordingly, the Court will forego analyzing the Park Restrictions under the remaining preliminary injunction prongs, and limits its analysis to the Megaphone Restrictions.

### 2. *Likely to Suffer Irreparable Harm*

Under Ninth Circuit caselaw, "a party seeking preliminary injunctive relief in a First Amendment context can establish injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (cleaned up); *see also Am. Beverage Ass'n*, 916 F.3d at 758; *Harris*, 772 F.3d at 583. This is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (cleaned up). Here, Sierra Club has demonstrated the existence of a colorable First Amendment claim against the Megaphone Restriction. Accordingly, the Court finds this factor weighs in favor of enjoining the restriction.

### 3. *Balance of Equities/Public Interest*

Assessing the balance of equities requires the Court to weigh the interests of all parties involved and assess their respective potential damage. *Sormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009). Here, as already noted, because the Megaphone Restriction likely runs afoul of constitutional guarantees, Sierra Club faces potential irreparable harm from the infringement of its rights under the First Amendment. The City faces the possibility of its residents being disturbed by unwanted noise. While the City's potential harm is real, it does not outweigh the harm from First Amendment violations. Further, considering the "significant public interest in upholding First Amendment principles," the Court finds this final factor to weigh in favor of enjoining the Megaphone Restriction. *Harris*, 772 F.3d at 583; *see also Melendres v. Arpaio*, 695 F.3d 990, 1002

MEMORANDUM DECISION AND ORDER – 19

(9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (cleaned up).

## V. CONCLUSION

Sierra Club has shown that it is likely to succeed on the merits of its challenge of the Megaphone Restriction. It has shown that it is likely to suffer irreparable harm if the restriction is enforced, and that both the balance of the equities and the public interest support an injunction of the ordinance. Accordingly, the Court hereby enjoins enforcement of the Megaphone Restriction. But, conscious of the Supreme Court's recent order in *Poe*, the Court emphasizes that the injunction applies only to the parties at the bar and only to Boise's downtown area. *See* 144 S. Ct. at 921.

On the other hand, Sierra Club has not shown that it is likely to succeed on the merits of its challenge of the Park Restrictions. Due to this failure, and because Sierra Club did not raise questions about the Park Restrictions that could not be answered at the hearing, the Court declined to analyze the Park Restrictions under the remaining preliminary injunction factors. It also declines to enjoin enforcement of the Park Restrictions—meaning the Park Restrictions remain in effect in their entirety.

## VI. ORDER

The Court HEREBY ORDERS:

1. Sierra Club's Motion for Preliminary Injunction is hereby GRANTED in part and DENIED in part.

    a. The Court enjoins enforcement of Boise City Code § 5-7-3 against Sierra Club in the downtown area of Boise while this lawsuit is pending.

MEMORANDUM DECISION AND ORDER – 20

b.  The Court does not enjoin enforcement of Boise City Code § 7-7A-5(D)(4)
    nor Boise City Code § 7-7A-7(C). Both of those ordinances remain in full
    effect.

DATED: April 29, 2024

David C. Nye
Chief U.S. District Court Judge